1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11

RANDY LEE SCROGGINS,

Case No. 1:24-cv-00519-JLT-CDB  (HC)

12

Petitioner,

**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY**[1]

13

v.

14

STEVE SMITH,

15

Respondent.

**14-DAY DEADLINE**

16

(Doc. 1)

17

18       On May 1, 2024, Petitioner Randy Lee Scroggins ("Petitioner"), a state prisoner

19   proceeding pro se and *in forma pauperis*, filed a petition for writ of habeas corpus under 28

20   U.S.C. § 2254 ("Petition").  (Doc. 1).  For the reasons set forth below, the undersigned

21   recommends that the district court deny the Petition and decline to issue a certificate of

22   appealability.

23       **I.       PROCEDURAL AND FACTUAL BACKGROUND**

24       On December 13, 2019, a jury in the Tulare County Superior Court convicted Petitioner of

25   attempted murder with additional findings regarding the use of a firearm and causing bodily

26   injury; assault with a firearm; injuring a spouse; being a felon in possession of a firearm; and

27

28

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302(c)(17) (E.D. Cal. 2025).

1    unlawful possession of ammunition.  (Doc. 16-28 at 9-10; *see* Doc. 16-18 at 222-27).[2]  The court

2    sentenced Petitioner to a total of 81 years to life in prison.  (Doc. 16-28 at 11; Doc. 16-20 at 130-

3    33).

4            On appeal, the Second Appellate District Court of Appeal summarized the pertinent facts

5    of the underlying offense,[3] and outlined the relevant trial proceedings:

6                    I.      BACKGROUND

7                    *A.  The Shooting and the Police Response*

8                    In May 2019, defendant, L.R., and her children, I.M., Le.M., and
                     La.M., lived in Farmersville, a city near Fresno. Defendant and L.R.
9                    argued about L.R.'s Facebook account in their front yard. The
                     argument became physical. L.R. bit defendant, and defendant
10                   slapped L.R.

11                   Defendant and L.R. argued over her Facebook account again on
                     May 22, 2019. Defendant's brother, Baudelio Luna (Luna), was
12                   also present at the house. Luna suggested defendant and L.R. take a
                     break from arguing, and offered to drive L.R. and her children to
13                   another location. Defendant agreed. Luna, Le.M., and La.M. went
                     outside to Luna's car. Defendant exited the home and then
14                   reentered, locking the screen door behind him. As Luna, Le.M., and
                     La.M. were loading the car, they heard a gunshot.
15
                     A few moments later, defendant and L.R. came toward the front
16                   door. Defendant supported L.R., who had blood dripping down her
                     arm as she opened the screen door. L.R. said "the idiot shot me"
17                   after walking outside. Defendant tried to get L.R. into a car to take
                     her to the hospital.
18
                     Luna convinced defendant to give him his (defendant's) gun. Luna
19                   ejected the clip and cleared the gun. He then gave it to James,
                     defendant's son, who took the gun inside his house, a separate
20                   home on the same property.

21                   When I.M. arrived at the home and saw L.R. bloody and holding
                     her arm, I.M. asked defendant why he shot L.R. Defendant admitted
22                   he shot L.R. but he did not explain why. I.M. called 911, and while
                     he was on the phone, defendant said he was "done" and ran away,
23                   fleeing into nearby orchards.

24                   Officer Ashley Hoppert of the Farmersville Police Department
                     responded to the 911 call. Upon arriving, Officer Hoppert observed
25                   L.R. rolling on the ground, wailing and screaming in pain. L.R. told
                     Officer Hoppert she had been shot with a black handgun. Officer
26

27    ─────────────────
      [2] Record citations herein are to the CM/ECF-assigned pages.

28    [3] These facts are entitled to a rebuttable presumption of correctness.  *See* 28 U.S.C. § 2254(e)(1);
      *Crittenden v. Chappell*, 804 F.3d 998, 1011 (9th Cir. 2015).

                                                    2

Hoppert observed a through and through gunshot wound below L.R.'s left wrist, and a wound to her left shoulder, which appeared to have a bullet lodged in it. L.R. stated she had been shot once and denied having brought her arm up when she was shot. L.R. told Officer Hoppert she and defendant had been arguing for the last week over dumb stuff.

James Scroggins turned defendant's gun over to another police officer at the scene. A detective retrieved a single spent shell casing inside the home. Detective Richard Morley located defendant and took him into custody.

*B. Trial*

In October 2019, the Tulare County District Attorney's Office charged defendant in a 12-count information. Six of the counts—attempted murder (count 1), assault with a firearm (count 2), false imprisonment (count 3), injuring a spouse (count 6), and cruelty to a child (counts 9 and 10)—were brought in connection with the shooting on May 22, 2019. Two of the counts related to acts defendant committed against L.R. on May 21, 2019, namely assault with a firearm (count 4) and dissuading a witness from reporting a crime (count 5). The remaining counts, for being a felon in possession of a firearm (count 7) and possession of ammunition (count 8), were based on actions taken on or about and between both dates. Firearm, Three Strikes law, and prior felony conviction enhancements were also alleged.

At trial, I.M., La.M., Le.M., Luna, and James Scroggins testified, as did officers from the Farmersville Police Department and others involved in the investigation. Several of the witnesses testified to hearing defendant admit he shot L.R.—indeed, the fact of the shooting was not contested by the defense (the defense theory was the gun accidentally discharged when L.R. tried to disarm defendant so he would not commit suicide). The prosecution also introduced evidence that Le.M. told an investigator that she saw defendant drag L.R. by the hair the day before the shooting and—after the shooting—heard defendant say "because she's a 'ho'" when asked why he shot L.R. In addition—as we now describe in greater detail in light of the principal issue raised on appeal—L.R. was also called as a witness.

*1. The initial colloquy regarding whether L.R. will testify*

The prosecution called L.R. to testify. After stating her name for the record and stating defendant was her husband, L.R. said she was choosing not to testify against her husband. The prosecution asked the court to order L.R. to testify.

The trial court then informed L.R. that because the matter was a criminal proceeding, L.R. did not have the right to refuse to testify against her husband. In response, L.R. asked if that was true under section 1219 of the "California Code." The trial court told L.R. that if she did not testify the court would have the option of having her arrested and held in contempt of court, and L.R. could be

3

incarcerated for up to six months. L.R. questioned whether the contempt remedy applied and defendant interposed an objection but did not articulate a basis for it.

The trial court reiterated the law permitted L.R. to be found in contempt of court and incarcerated for the duration of the trial or prosecuted for a longer amount of jail time. L.R. asked if she could assert marital privilege. The court maintained she could not and reiterated that if she did not testify she would be subjecting herself to criminal prosecution and incarceration. L.R. acquiesced and agreed to testify.

Counsel for defendant asked to "make a record." The court said counsel could be heard later, and overrode his subsequent attempt to interject, stating they were bringing in the jury.

*2. L.R.'s testimony*

Under questioning from the prosecutor, L.R. testified that at some point toward the beginning of the day on May 22, defendant came into their bedroom and woke her up and they began arguing about Facebook, a topic about which they had been arguing for a month. (Earlier in the week, L.R. left the house for a few hours and went to her daughter's residence. L.R. returned home because things had calmed.) They moved the argument into the garage, where they remained for two to three hours.

When asked, L.R. said she did not recall speaking to a Deputy Gates; she also testified reviewing a transcript of her statement to Deputy Gates did not refresh her recollection. L.R. denied telling the deputy she returned to the home because defendant threatened to hurt her children if she did not. When the prosecutor stated she had said those words, L.R. said she did not remember. She denied telling Deputy Gates that defendant was going to hurt himself and had a gun. She also denied there was an incident between her and defendant involving a firearm on May 21 in which defendant pushed a gun against her head. L.R. also denied pointing out for the deputy the area on her head where defendant pushed the gun or claiming it left a mark. L.R. additionally denied seeing defendant with a gun prior to May 22 and asking to leave the garage that day when arguing with defendant.

L.R. testified she wanted to stop fighting with defendant and leave the situation alone. When asked about a prior statement in which she said defendant got angrier and more violent, and then went outside, grabbed a crowbar, and tried to hit her with it, L.R. said the part about the crowbar was untrue.

L.R. stated that after the argument in the garage, she went back into the house and slept for a few hours, until the afternoon. L.R. said a document describing her prior statements was not true when it said defendant dragged her by the hair. She said she did not remember her kids seeing it and stopping defendant.

L.R. testified she was grabbing her stuff to leave when she learned

4

Luna was going to take her and the children somewhere else. Le.M. and La.M. were outside already, and Luna walked outside as well.

### 3. The trial court correctly advises L.R.

The trial court took a recess at this point in L.R.'s testimony. Defendant requested to make an argument outside of the presence of the jury regarding a mistrial. The trial court stated it intended to proceed. Defendant objected to not being able to make a record. The court then invited counsel to sidebar.

At sidebar, the prosecutor agreed with defense counsel that Code of Civil Procedure section 1219, subdivision (b), specified the maximum punishment for a domestic violence victim's refusal to testify is a fine. Defendant requested a mistrial. The trial court did not grant a mistrial and stated it would correctly advise L.R. of the consequences of her refusal to testify. Defendant then requested counsel be appointed for L.R. The court denied the request and indicated that if L.R. refused to testify, her testimony would be stricken from the record and the jury would be instructed to disregard it.

After concluding the sidebar, the court stated for the record that counsel agreed the maximum punishment L.R. could face for refusing to testify against defendant was a $10,000 fine, not jail time. L.R. asked the court to clarify whether a $10,000 fine would definitely be imposed. The court said no and explained the chain of potential consequences of refusing to testify. L.R. then requested and received a minute to consider the court's updated advisement. She ultimately decided she would not testify against defendant.

### 4. Subsequent proceedings concerning L.R.'s testimony

When the jury returned to the courtroom, the trial court informed the jury L.R. had left the witness stand and stated it was striking L.R.'s testimony. The court instructed the jury not to consider the testimony during the course of the trial, or to allow it to affect their verdict. L.R. later confirmed in the presence of the jury that she was choosing not to testify.

Defendant orally moved for a mistrial, arguing L.R.'s testimony was highly prejudicial, particularly the testimony regarding prior bad acts for which there were no other witnesses. Defendant argued there was no way to "unring the bell," and contended he would be deprived of a fair trial. The trial court denied the motion.

When the trial court instructed the jury, it reminded the jury it had stricken L.R.'s testimony from the record and again instructed the jury to disregard it and not consider it for any purpose. The court also instructed the jury that nothing the attorneys say is evidence and their questions are not evidence. It further instructed the jury not to "assume something is true just because one of the attorneys asked a question that suggested it was true."

Defendant subsequently asked the trial court to state on the record

5

the reasons for its denial of his request for a mistrial. The trial court did so, explaining the evidence against defendant through the examination of other witnesses was strong and complete. The court opined that, if anything, L.R.'s stricken testimony was favorable to defendant because she denied any criminal wrongdoing on defendant's part. The court additionally emphasized it had stricken the testimony, admonished the jury to disregard it, and had reminded the jury of that during its recitation of the jury instructions. The court concluded there was nothing about L.R.'s aborted testimony that unfairly advantaged the prosecution.

*D.*      *Verdict and Sentencing*

*1.*      *Verdict*

The jury found defendant guilty of attempted murder (count 1) and found true associated allegations that defendant personally and intentionally discharged a firearm that caused great bodily injury to L.R., that defendant personally and intentionally discharged a firearm, that defendant personally and intentionally used a firearm, and that defendant personally inflicted great bodily injury on L.R. The jury also found defendant guilty of assault with a firearm (count 2) and injuring a spouse (count 6). As to both of those counts, the jury found true allegations that defendant personally and intentionally used a firearm and personally inflicted great bodily injury on L.R. Finally, the jury found defendant guilty of being a felon in possession of a firearm (count 7) and of possession of ammunition (count 8). The trial court separately found true allegations that defendant sustained three prior convictions qualifying as "strikes" under the Three Strikes law.

*2.*      *Motion for new trial*

After the verdicts, defendant filed a motion for new trial based on the trial court's incorrect advisement to L.R. concerning the consequences of declining to testify and the decision to overrule the defense objection prior to L.R.'s (misadvised) decision to testify. The trial court acknowledged its instruction to L.R. stating she could be imprisoned for refusing to testify against defendant was clearly erroneous. But it found the error had not resulted in a miscarriage of justice. In so finding, the court reasoned L.R.'s testimony consisted primarily of denials of defendant's wrongdoing during the days preceding the shooting and noted there were no subsequent witnesses called to impeach those denials. The court also emphasized its decision to strike the testimony immediately after L.R. declined to testify further, the multiple admonitions it gave the jury to disregard L.R.'s testimony, and the strength of the other evidence against defendant, which the court believed was overwhelming.

*3.*      *Sentencing*

The trial court sentenced defendant to a total of 81 years to life in prison. On the attempted murder conviction (count 1), the court imposed a sentence of 42 years to life pursuant to section 1170.12,

1

2

3

4

5

subdivision (c)(2)(A)(iii), plus 25 years to life for discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d)) and 10 years for defendant's two prior serious felony convictions. On the felon in possession of a firearm conviction, the court imposed a term of four years, consecutive to the sentence on count 1. Sentences and enhancements on the assault with a firearm, injuring a spouse, and possession of ammunition convictions (counts 2, 6, and 8) were either ordered stricken or imposed and stayed pursuant to section 654.

6

7

8

Defendant was ordered to pay a restitution fine in the amount of $10,000 pursuant to section 1202.4. The court also imposed a court operations assessment in the amount of $240 and a criminal conviction assessment in the amount of $180.

9

10

11

12

13

14

Defendant asked the court to stay all fines and fees until the People proved he had the ability to pay them. The court said it was not inclined to stay the fines because defendant had the ability to work in prison. The court referenced a letter from a friend and sometime co-employee of defendant indicating defendant was a good worker, and concluded defendant should be able to meet the demands of the fines while incarcerated. Defendant argued he would not likely earn a gainful income because the prison work program is not a regular salary, he would be in prison for a very long time, and there was no reasonable likelihood he would be able to pay. The court found defendant had the ability to earn and pay all the fees and fines imposed.

15

16

Defendant represented he had accrued 412 days of custody credits, and he was credited in that amount.

17

18

19

(Doc. 16-28 at 2-12 (footnotes omitted)).  The appellate court affirmed Petitioner's convictions but remanded for further proceedings concerning Petitioner's sentence.  (*Id.* at 23).  On May 17, 2023, the California Supreme Court summarily denied review.  (*See* Doc. 16-30).

20

21

22

23

24

25

26

Petitioner filed the instant Petition on May 1, 2024.  (Doc. 1).  The Petition raises a single ground for relief, arguing that the "jury's receipt of complaining witness's subsequently stricken testimony, given after the trial court's erroneous advisement" violated both his right to confront the witnesses against him and his right to due process.  (*Id.* at 5).  On September 2, 2025, Respondent filed an answer (Doc. 17), arguing Petitioner was not entitled to habeas relief, and lodged the state court record in support (Docs. 16, 16-1 through 16-30).  Petitioner constructively filed a traverse on October 1, 2025.  (Doc. 18).

27

## II.    STANDARD FOR FEDERAL HABEAS RELIEF

28

A federal court's statutory authority to issue habeas corpus relief for persons in state

7

1    custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

2    Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

3    first "exhaust[t] the remedies available in the courts of the State."[4]  28 U.S.C. § 2254(b)(1)(A).

4    Where the state court adjudicates the claim on the merits, a petitioner is not entitled to habeas

5    relief unless the adjudication (1) "resulted in a decision that was contrary to, or involved an

6    unreasonable application of, clearly established Federal law, as determined by the Supreme Court

7    of the United States," or (2) "resulted in a decision that was based on an unreasonable

8    determination of the facts in light of the evidence presented in the State court proceeding."  28

9    U.S.C. § 2254(d).

10          "Deciding whether a state court's decision 'involved' an unreasonable application of

11   federal law or was 'based on' an unreasonable determination of the facts requires the federal

12   habeas court to train its attention on the particular reasons—both legal and factual—why state

13   courts rejected a state prisoner's federal claims."  *Wilson v. Sellers*, 584 U.S. 122, 125 (2018)

14   (internal quotation and citation omitted). When the state court's decision "does not come

15   accompanied with [its] reasons" for the decision, a federal court "should 'look through' the

16   unexplained decision to the last related state-court decision that does provide a relevant

17   rationale."  *Id.*  However, when there is no reasoned decision to "look through," it may be

18   presumed—in "the absence of any indication or state-law procedural principles to the contrary"—

19   that the state court adjudicated the claim on the merits and the petitioner must show "there was no

20   reasonable basis for the state court to deny relief."  *Harrington v. Richter*, 562 U.S. 86, 98-99

21   (2011).

22          Under 2254(d)(1), a decision is "contrary to" clearly established federal law if the state

23   court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case

24   law; or (2) reached a different result from the Supreme Court when faced with materially

25   indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).  A state court decision

26   involves an "unreasonable application" of the Supreme Court's precedents if the state court

27   correctly identifies the governing legal principle but applies the facts of the petitioner's case in an

28   ───────────────────────────────
[4] The statute allows for limited exceptions inapplicable here.  *See* 28 U.S.C. § 2254(b)(1)(B).

1    objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state

2    court either unreasonably extends a legal principle from [Supreme Court] precedent to a new

3    context where it should not apply or unreasonably refuses to extend that principle to a new

4    context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "A state court's

5    determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

6    jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at

7    101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The petitioner must show that

8    the state court decision "was so lacking in justification that there was an error well understood

9    and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at

10   103.

11          Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely

12   because the federal habeas court would have reached a different conclusion in the first instance."

13   *Wood v. Allen*, 558 U.S. 290, 301 (2010). "State courts are accorded substantial deference. If

14   reasonable minds reviewing the record might disagree about the finding in question, on habeas

15   review that does not suffice to supersede the trial court's determination." *Marks v. Davis*, 106

16   F.4th 941, 949 (9th Cir. 2024) (citations and quotation marks omitted) (quoting *Brumfield v.*

17   *Cain*, 576 U.S. 305, 314 (2015)).

18   **III.    ANALYSIS**

19          Petitioner alleges that his confrontation clause and due process rights were violated when

20   the jury heard some testimony from his wife without Petitioner having an opportunity to cross

21   examine her. (Doc. 1 at 5).

22   **A. Background**

23          At trial, the prosecution called Petitioner's wife, L.R., to testify and she indicated her

24   desire not to testify against her husband. (Doc. 16-7 at 120). The trial court advised her that if

25   she failed to testify, she could be held in contempt and incarcerated. (*Id.* at 120-22). L.R.

26   proceeded to testify.

27          In her testimony, L.R. indicated that on May 22, she and Petitioner were arguing about

28   Facebook, which had been an ongoing issue for the past month. (*Id.* at 122-24). L.R. testified that

earlier in the week, she had left her residence for "a couple of hours" to go to her daughters and allow things to calm down. (*Id.* at 124). The prosecution questioned her regarding statements she made to a deputy at the hospital that she returned home after four days because Petitioner threatened to harm L.R.'s kids, but L.R. denied making the statements. (*Id.* at 124-27). The prosecution also asked L.R. about her report to the deputy that the day before the shooting, Petitioner pushed a gun against her head, but L.R. again denied the statements. (*Id.* at 127-30). L.R. also denied reporting that Petitioner dragged her by the hair before the shooting. (*Id.* at 132-33).

Following a break in the proceedings, defense counsel requested to make an argument out of the presence of the jury regarding a mistrial, and the court and attorneys held a sidebar conference. (*See* Doc. 16-7 at 135-36). At sidebar, the parties agreed the trial court had misadvised L.R. and that the actual maximum punishment for refusing to testify was a fine. (Doc. 16-16 at 5). The trial court refused defense counsel's requests for a mistrial and that L.R. be appointed counsel, and indicated that if L.R. refused to testify further, her testimony would be stricken from the record. (*Id.* at 5-6).

The trial court then advised L.R. that the maximum punishment she could face if she chose not to testify would be a fine rather than imprisonment. (Doc. 16-7 at 136-37). After taking time to consider, L.R. indicated she was not going to testify further against Petitioner. (*Id.* at 138). The trial court struck the testimony of L.R. and instructed the jury that they were not to consider the testimony in any way or allow it to affect their decision. (*Id.* at 142-43). During jury instructions, the trial court advised the jury that "[n]othing the attorneys say is evidence," including their questions, which "are significant only if they helped [the jury] to understand the witnesses' answers." (Doc. 16-8 at 54). The trial court also reminded the jury that L.R.'s testimony was stricken, and they were to disregard it and not consider it for any purpose. (*Id.* at 54-55).

### B. State Appellate Court Ruling

On appeal, Petitioner challenged the denial of a mistrial or new trial, asserting that his confrontation and due process rights were violated by L.R.'s brief testimony. (*See* Doc. No. 16-

28 at 2). The state appellate court rejected both these arguments, explaining:

### 1. *Confrontation rights*

Relying primarily on *People v. Shipe* (1975) 49 Cal.App.3d 343 (*Shipe*), defendant contends his confrontation rights were violated and he was irreparably prejudiced by the violation. In *Shipe*, the police arrested the defendant and two other men for murdering a drug dealer. (*Id.* at 345-346.) The other men pled guilty to being accessories after the fact, and the prosecutor subsequently called them as witnesses at the defendant's trial.

Each of the men answered preliminary questions but then asserted the Fifth Amendment when the prosecutor began asking questions about the incident. (*Shipe*, *supra*, 49 Cal.App.3d at 346.) The court determined the witnesses did not have the right to assert the Fifth Amendment privilege and ordered them to answer. The prosecutor asked both witnesses leading questions such as, "'Is it not true that . . . you came back and saw the body of [the victim and] that [the defendant] was on top of him?'" and "'Is it not further true . . . that in your presence [the victim] was stabbed multiple times by your brother, [the defendant]?'" (*Id.* at 347-348.) By asking these questions, "the prosecutor placed before the jury information which overwhelmingly established [the defendant] as the murderer, provided a narcotics-related motive for the crime, and provided a basis for the inference that two witnesses had revealed this information in their statements to the authorities." (*People v. Burciago* (1978) 81 Cal.App.3d 151, 164.)

The *Shipe* court reversed the conviction and held the prosecutor's questions violated the defendant's Confrontation Clause rights. (*Shipe*, *supra*, 49 Cal.App.3d at 349, 355.) The court called the prosecutor's questions "flagrantly suggestive" and stated a prosecutor may not, "under the guise of cross-examination, get before the jury what is tantamount to devastating direct testimony." (*Id.* at 351, 349.) The court also concluded the People could not demonstrate the confrontation violation did not contribute to the verdict obtained because the evidence of the defendant's guilt was "entirely circumstantial." (*Id.* at 355.)

The pertinent facts in *Shipe* differ from the facts here in two key respects. First, in *Shipe*, the testimony in question was not stricken. (*Shipe*, *supra*, 49 Cal.App.3d at 346-349.) Here, by contrast, the trial court struck the entirety of L.R.'s testimony and instructed the jurors they were not to consider her testimony or allow it to affect their decision. During its delivery of jury instructions, the trial court reminded the jury it had stricken L.R.'s testimony and again instructed it to disregard the testimony. The trial court also instructed the jury that the attorneys' questions were not evidence, and not to assume something was true because an attorney's question suggested it was true. These differences are important because "[t]he assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the Confrontation Clause are at issue." (*Tennessee v. Street* (1985) 471

11

1    U.S. 409, 415, fn. 6; accord, *People v. Smithey* (1999) 20 Cal.4th
2    936, 962 [holding the defendant was not denied his right to
     confrontation where "the jury was instructed to disregard all
     questions regarding defendant's intent and any answers"].) As a
3    result, we assume the jury followed the court's instructions.

4    Second, in *Shipe*, there was no significant independent evidence of
     guilt other than what was brought out by the challenged
5    questioning. (*Shipe, supra*, 49 Cal.App.3d at 355 ["The evidence of
     appellant's guilt was entirely circumstantial . . ."].) Here, however,
6    the other evidence of defendant's guilt on the crimes of conviction
     was strong. Defendant was the only person in the home with L.R. at
7    the time of the shooting. After she was shot, L.R. identified
     defendant as the person who shot her, and defendant admitted the
8    same to I.M. Defendant and L.R. had been fighting the week of the
     shooting, and one of their arguments turned violent. Though
9    L.R. had two wounds, one below her left wrist, which the bullet
     went through, and a wound to her left shoulder, where the bullet
10   lodged, the evidence reflected only one shot was fired. The jury
     could properly find based on all this evidence (and Le.M.'s
11   statement to the investigator about defendant's post-shooting
     "because she's a ho" statement) that defendant attempted to kill
12   L.R. and she raised her arm to shield herself when defendant fired
     (though L.R. denied this). (See, e.g., *People v. Smith* (2005) 37
13   Cal.4th 733, 741-742 [act of firing a gun toward a victim at a close,
     but not point blank, range is sufficient to support an inference of
14   intent to kill where the shot could have inflicted a mortal wound
     had the shot been on target].)
15
16   In contrast to *Shipe* and the other cases on which defendant relies,
     the facts here are more akin to those found in *People v. Morgain*
17   (2009) 177 Cal.App.4th 454 (*Morgain*). That case holds a
     defendant's right to confrontation was not violated where a witness
18   was granted use immunity and ordered to testify but refused to
     answer a handful of questions posed by the prosecutor, including
19   whether the defendant told her that he shot the victim. (*Id.* at 459-
     462.) The trial court in *Morgain*, like the trial court here, granted
20   the defendant's motion to strike the entirety of the witness's
     testimony and instructed the jury not to consider the prosecution's
21   questions as evidence. (*Id.* at 462, 465.) The *Morgain* court held the
     defendant suffered no infringement of his Confrontation Clause
22   rights requiring retrial because the trial court struck the witness's
     testimony, because the court instructed the jury not to consider the
23   prosecution's questions as evidence, and because there was
     independent evidence of defendant's guilt. (*Id.* at 465-466.) The
24   facts here are analogous and we reach the same conclusion.
25
          2. *Due process*
26
     Defendant also contends his Fourteenth Amendment due process
27   right to a fair trial was violated by L.R.'s testimony. In so arguing,
     defendant acknowledges that, generally, "the admission of improper
28   evidence is harmless if it is subsequently stricken out and the jury is
     told to disregard it." (*People v. Sourisseau* (1944) 62 Cal.App.2d
     917, 929.) However, he contends L.R.'s testimony was so

1

prejudicial that striking it and admonishing the jury to disregard it could not cure the error.

2

3

In support of this argument, defendant cites a handful of cases in which appellate courts have held a mistrial should have been granted on significantly different facts. (See, e.g. *People v. Allen* (1978) 77 Cal.App.3d 924, 934-935 [reference to the defendant's parole status was not cured by trial court striking testimony and admonishing jury where the evidence presented an extremely close case] (*Allen*); *People v. Ozuna* (1963) 213 Cal.App.2d 338, 339, 342 [admonition to jury did not remove harmful effect of testimony referring to defendant as "ex-convict"; evidence was not strong enough to preclude finding of innocence] (*Ozuna*); *People v. Bentley* (1955) 131 Cal.App.2d 687, 689-690 [curative admonition insufficient where police witness in child sexual abuse case improperly revealed defendant's suspected involvement in prior similar cases and another witness revealed the defendant "trie[d] to date up all the married women in the neighborhood"] (*Bentley*); *People v. Navarrete* (2010) 181 Cal.App.4th 828, 834 [curative instruction could not undo prejudice where jury was likely to interpret testimony to mean the defendant made a confession of guilt] (*Navarrete*).) All of these cases involve "exceptional" circumstances in which "'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' [Citation.]" (*Allen, supra,* 77 Cal.App.3d at 935.) The testimony in *Allen* and *Ozuna*, for instance, improperly revealed the respective defendants had prior convictions. The subject testimony in *Bentley* indicated the defendant, charged with child abuse, had previously been suspected of abusing another child. And the testimony in *Navarrete* suggested the defendant had confessed to the crime. Here, by contrast, L.R.'s answers to questions before refusing to testify further mainly augmented testimony by other witnesses establishing that she and defendant had been arguing, and one of those arguments had turned physical. That is not an "exceptional" circumstance like those in the cited cases.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

(Doc. 16-28 at 13-18 (footnote omitted)).

21

## C. Arguments and Analysis

22

Petitioner argues L.R.'s testimony violated his right to confront the witnesses against him

23

because the prosecution used her questions to read L.R.'s previous testimonial statements into the

24

record and allow the jury to hear the contents of these inculpatory statements. (Doc. 1 at 31).

25

Petitioner argues the state appellate court's rejection of his confrontation claim was contrary to

26

*Douglas v. Alabama*, 380 U.S. 415 (1965) because the prosecutor's questioning was so suggestive

27

that it overpowered the jury's ability to follow the court's instructions. (*Id.* at 34). Similarly,

28

Petitioner asserts his due process right to have his guilt decided solely on the basis of evidence

13

1    admitted at trial was violated because "the jurors heard that petitioner engaged in additional

2    violence which went far beyond merely engaging in an argument with L.R. which 'turned

3    physical.'" (*Id.* at 35-36). Finally, Petitioner argues the error had a substantial and injurious

4    effect on the verdict because "L.R.'s testimony struck right at the heart" of his defense that the

5    shooting was accidental. (*Id.* at 37).

6         Respondent argues the state court's reasoned rejections of Petitioner's claims were not

7    contrary to, or an unreasonable application of, federal law. (Doc. 17 at 16). Respondent argues

8    *Douglas* "is inapt" because in that case, "the trial court neither struck the testimony at issue nor

9    instructed the jury to wholly disregard it." (*Id.* at 17). Additionally, Respondent argues that

10   unlike in *Douglas* where the prosecutor "read the entire confession of Douglas's co-conspirator

11   into the record, line by line," the prosecutor here "referenced the victim's statements to

12   investigator's only to refresh her recollection when the victim allegedly could not remember her

13   statements" and the questioning otherwise "focused on the actual events and on eliciting the

14   victim's testimony about what happened." (*Id.*). Further, Respondent argues the trial court

15   remedied any error by striking L.R.'s testimony and while Petitioner "asserts that the jury was

16   overpowered by the prosecutor's questions and unable to follow the court's instructions," he

17   "does not persuasively explain why." (*Id.* at 18). Thus, Respondent's position is that the state

18   court reasonably rejected both Petitioner's confrontation and due process claims. (*Id.* at 19-20).

19   Further, Respondent argues the "strong independent direct evidence of Petitioner's guilt apart

20   from the victim's testimony" means that any error did not have a substantial and injurious effect

21   on the verdict. (*Id.* at 20-21).

22        Petitioner responds that since "[t]he jury heard L.R.'s direct examination testimony but

23   defense counsel never had a chance to cross-examine her," there was a "textbook confrontation

24   violation." (Doc. 18 at 6). Petitioner argues that the trial's court striking the testimony "did not

25   prevent the jury from hearing it" and therefore did not cure the confrontation violation. (*Id.*).

26   Petitioner further argues that the evidence the state appellate court relied on as "strong

27   independent evidence of [his] guilt" only establishes that he shot L.R., which he does not dispute,

28   but only L.R.'s testimony showed a pattern of violence that would undermine Petitioner's

1    accident defense.  (*Id.* at 9-11).

2        "The Sixth Amendment's Confrontation Clause provides that, 'in all criminal

3    prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him.'"

4    *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (internal alterations omitted).  "[T]he main and

5    essential purpose of confrontation is to secure for the opponent the opportunity of cross-

6    examination."  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (citation modified).

7        Based on Petitioner's reliance on *Douglas*, a review of the facts in that case is warranted.

8    Douglas "and one Loyd were tried separately … on charges of assault with intent to murder."

9    *Douglas*, 380 U.S. at 416.  Loyd was tried and convicted and was subsequently called to testify at

10   Douglas's trial.  *Id.*  However, because he intended to appeal his conviction, Loyd invoked his

11   privilege against self-incrimination and refused to answer any questions.  *Id.*  After receiving

12   permission to treat Loyd as a hostile witness, the prosecutor "produced a document said to be a

13   confession signed by Loyd" and "[u]nder the guise of cross-examination to refresh Loyd's

14   recollection," proceeded to read the document.  *Id.*  When asked if he had made the various

15   statements in the document, Loyd asserted the privilege and refused to answer.  *Id.*  Douglas was

16   found guilty, the Court of Appeals of Alabama affirmed, and the Supreme Court of Alabama

17   denied review.  *Id.* at 418.

18       The United States Supreme Court granted certiorari and reversed Douglas's conviction.

19   *Id.*  The Court concluded "petitioner's inability to cross-examine Loyd as to the alleged

20   confession plainly denied him the right of cross-examination secured by the Confrontation

21   Clause."  *Id.* at 419.  Critically, "Loyd's alleged statement that [Douglas] fired the shotgun

22   constituted the only direct evidence that he had done so; coupled with the description of the

23   circumstances surrounding the shooting, this formed a crucial link in the proof both of petitioner's

24   act and of the requisite intent to murder."  *Id.*  The Court specifically noted that the prosecution's

25   reading of Loyd's statement "may well have been the equivalent in the jury's mind of testimony

26   that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in

27   which the jury might improperly infer both that the statement had been made and that it was

28   true."  *Id.*  Thus, the Court concluded the circumstances were "such that 'inferences from a

1    witness' refusal to answer added critical weight to the prosecution's case in a form not subject to

2    cross-examination, and thus unfairly prejudiced the defendant.'"  *Id.* at 420.

3            The undersigned agrees with Respondent that the circumstances here are significantly

4    different than those presented in *Douglas*.  Here, after L.R. refused to testify, the trial court struck

5    her testimony and ordered the jury that it could not be considered for any purpose.  (Doc. 16-16 at

6    142-43; Doc. 16-8 at 54-55).  Striking the testimony was an appropriate remedy following L.R.'s

7    refusal to continue.  *See United States v. Case*, 851 F. App'x 105, 106 (9th Cir. 2021)

8    ("Moreover, to the extent [defendant] believed he was prejudiced by his inability to cross-

9    examine [witness], any such prejudice would have been remedied by striking [witness's]

10   testimony in its entirety and instructing the jury to disregard it."); *United States v. Wilmore*, 381

11   F.3d 868, 873 (9th Cir. 2004) (finding witness's testimony obtained in violation of the

12   Confrontation Clause "should have been stricken"); *United States v. Seifert*, 648 F.2d 557, 561

13   (9th Cir. 1980) ("Where a witness asserts a valid privilege … on cross-examination, all or part of

14   that witness's testimony must be stricken if invocation of the privilege blocks inquiry into matters

15   which are 'direct' and not merely 'collateral.'").

16           Further, contrary to Petitioner's argument, the trial court eliminated any prejudice to

17   Petitioner by striking L.R.'s testimony.  The trial court instructed the jury to disregard L.R.'s

18   testimony immediately after determining she was no longer willing to testify and repeated the

19   instruction to not consider her testimony for any purpose in the closing instructions.  "A jury is

20   presumed to follow its instructions."  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  "The

21   assumption that jurors are able to follow the court's instructions fully applies when rights

22   guaranteed by the Confrontation Clause are at issue."  *Tennessee v. Street*, 471 U.S. 409, 415 n.6

23   (1985).  Additionally, L.R.'s testimony "was hardly the sort of statement that might be considered

24   so inherently and overwhelmingly incriminating that a jury could not be expected to follow an

25   explicit instruction directing them to disregard it."  *United States v. Saelee*, 51 F.4th 327, 345 (9th

26   Cir. 2022).  Rather, as highlighted by the state appellate court, L.R.'s testimony largely contained

27   *denials* of her previous statements to law enforcement.  (*See* Doc. 16-7 at 127-35).

28           Finally, contrary to Petitioner's argument, L.R.'s stricken testimony was not the only

1  evidence concerning violence between L.R. and Petitioner from which the jury could have

2  inferred Petitioner shot L.R. intentionally rather than by accident as he claimed.  I.M. testified

3  that earlier in the week, Petitioner and L.R. argued and the fight became physical, with Petitioner

4  on top of L.R. wrestling; Petitioner admitted to shooting L.R.; and Petitioner ran away when I.M.

5  called law enforcement.  (Doc. 16-7 at 38-42).  Le.M. also testified that Petitioner and L.R got

6  physical while fighting, including Petitioner pulling L.R.'s hair.  (*Id.* at 57-58).  When questioned

7  regarding whether she previously told an investigator that Petitioner said, "I'll be back to kill your

8  mom," Le.M. indicated it had been a lie but still described Petitioner as "very abusive" and said

9  she feared "he was going to do something bad" when he locked the door while L.R. was still

10 inside the home.  (*Id.* at 60-62, 68).  Similarly, La.M. testified that while he did not remember

11 seeing Petitioner slap his mom, if he previously told a detective that he did, that was the truth.

12 (*Id.* at 78-79).  Thus, there was additional, unchallenged evidence establishing a pattern of

13 violence between the parties from which the jury could infer Petitioner shot L.R. intentionally

14 rather than accidentally.[5]

15         Ultimately, Petitioner has not shown that the state appellate court's rejection of his

16 confrontation and due process claims was contrary to, or an unreasonable application of, clearly

17 established federal law, or based on an unreasonable determination of the facts.  The undersigned

18 recommends that the petition be denied.

19         **IV.    CERTIFICATE OF APPEALABILITY**

20         "[A] state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

21 district court's denial of his application."  *Miller-El v. Cockell*, 537 U.S. 322, 335-36 (2003). Rule

22 11 of the Rules Governing § 2254 Cases requires a court to "issue or deny a certificate of

23 appealability when it enters a final order adverse to the applicant."  A certificate of appealability

24 will issue "only if the applicant has made a substantial showing of the denial of a constitutional

25 right."  28 U.S.C. § 2253(c)(2).  To make this showing for claims rejected on procedural grounds,

26 a movant must demonstrate "that jurists of reason would find it debatable whether the petition

27

28 [5] To the extent Petitioner argues there is an alternative inference that could have been drawn that would have
   supported his defense, "it is the responsibility of the jury—not the court—to decide what conclusions should be
   drawn from evidence admitted at trial."  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012).

1  states a valid claim of denial of a constitutional right and that jurists of reason would find it

2  debatable whether the district was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S.

3  473, 484 (2000). When a claim is rejected on the merits, the petitioner "must demonstrate that

4  reasonable jurists would find the district court's assessment of the constitutional claims debatable

5  or wrong" to warrant a certificate of appealability.

6        Because Petitioner has not made a substantial showing of the denial of a constitutional

7  right, the undersigned recommends that the court decline to issue a certificate of appealability.

8  **V.    RECOMMENDATION**

9        For the reasons set forth above, it is **RECOMMENDED**:

10      1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. 1);

11          and

12      2.  Petitioner be denied a certificate of appealability.

13        These findings and recommendations are submitted to the district judge assigned to this

14  action, pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the

15  United States District Court, Eastern District of California. Within **14 days** of service of this

16  recommendation, any party may file written objections to these findings and recommendations

17  with the Court and serve a copy on all parties. Such a document should be captioned "Objections

18  to Magistrate Judge's Findings and Recommendations" and **shall not exceed 15 pages** without

19  leave of Court and good cause shown. The Court will not consider exhibits attached to the

20  Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the

21  exhibit in the record by its CM/ECF document and page number, when possible, or otherwise

22  reference the exhibit with specificity. Any pages filed in excess of the 15-page limitation may be

23  disregarded by the District Judge when reviewing these Findings and Recommendations under 28

24  U.S.C. § 636(b)(l)(C). The parties are advised that failure to file objections within the specified

25  time may waive the right to appeal the district judge's order. *Wilkerson v. Wheeler*, 772 F.3d

26  ///

27  ///

28  ///

834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **October 14, 2025**

UNITED STATES MAGISTRATE JUDGE